

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-00340 |
| v. | ) | |
| | ) | 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 152(2) |
| | ) | 18 U.S.C. § 157 |
| | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 1014 |
| MAHAN JANBAKHSH | ) | 18 U.S.C. § 1344(1) |
| a/k/a MARK JANBAKHSH | ) | 18 U.S.C. § 1512(b)(3) |
| STEVEN L. PIPER | ) | 26 U.S.C. § 7206(1) |

# INDICTMENT

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times material to this Indictment:

1. "America's United Financial, LLC, and Affiliates" was a business that was made up of nine used car dealerships (the "Dealerships") and six related finance companies ("RFCs") located in and around Nashville, Tennessee (collectively, "Auto Masters").

2. **MAHAN JANBAKHSH** a/k/a **MARK JANBAKHSH** ("**MARK JANBAKHSH**") was the CEO of Auto Masters. **MARK JANBAKHSH** owned a one hundred percent (100%) share of two of the Auto Masters Dealerships and a one hundred percent (100%) share of one of the Auto Masters RFCs. **MARK JANBAKHSH** owned a fifty-one percent (51%) share of each of the remaining Auto Masters Dealerships and each of the remaining Auto Masters RFCs. Additionally, **MARK JANBAKHSH** owned other automobile, radio, and real estate related businesses, including Plaza Mariachi, which was an entertainment center and market in South Nashville.

3. R.J., an individual known to the Grand Jury, was a close relative of **MARK JANBAKHSH**. R.J. owned a minority interest (less than 50%) in three of the Auto Masters Dealerships and in one Auto Masters RFC.

4. **STEVEN L. PIPER** was a Certified Public Accountant. He was the CFO of all the Auto Masters entities and prepared the tax returns for the Auto Masters entities and for **MARK JANBAKHSH** personally.

5. The Dealerships sold used cars and provided car loans in connection with those sales. When a customer purchased a vehicle from a Dealership, the customer and the Dealership entered into a car loan agreement. Under the terms of the car loan agreement, the customer was required to make a down payment and to make regular payments (once or twice per month) on the loan until it was paid in full. The Dealership then sold the car loan to the associated RFC, and after that, the RFC owned the car loan. The Dealership collected the car loan payments from the customer and then gave those payments to the associated RFC.

6. C.Q., an individual known to the Grand Jury, was the loan portfolio and collection manager for Auto Masters. In that role, he was responsible for managing the collections department and was the administrator for the company's electronic database, which was called AMS. As the administrator, he controlled user logins and passwords and had the ability to control which users could view and access information within the AMS system.

7. In approximately 2013, Auto Masters had a line of credit with Capital One National Association ("Capital One") and First Tennessee Bank, now known as First Horizon Bank ("First Tennessee") (the "LOC"). Capital One and First Tennessee were each a "financial institution" with deposits insured by the Federal Deposit Insurance Corporation ("FDIC"), within the meaning

of Title 18, United States Code, Section 20, and for purposes of Title 18, United States Code, Section 1344.

8. A line of credit is like a loan that is extended to a borrower. The borrower is required to provide collateral in order to get the line of credit. Then, the borrower is allowed to take certain amounts of money as "draws" against of the line of credit, which the borrower is required to repay to the lender. Per the terms of the LOC, Capital One and First Tennessee each funded a portion of those "draws."

9. Between 2013 and 2017, the maximum principal balance on the LOC was increased at various times. By July 2017, the total amount available under the terms of the LOC was $63 million, and Auto Masters owed in excess of $62.9 million on the LOC.

10. The outstanding car loans held by the RFCs were used as collateral for the Auto Masters LOC. Auto Masters was allowed to take draws on the LOC in an amount of up to 65% of the total amount of "eligible loans." These "eligible loans" were the collateral for the LOC. They were also referred to as the "borrowing base" for the LOC. Each month, Auto Masters was required to give Capital One and First Tennessee a certified document that listed the total value of "eligible loans" that formed the "borrowing base." This certified document was referred to as the "borrowing base certificate."

11. According to the terms of the LOC, if a car loan was delinquent by 60 or more days, that loan was not an "eligible loan" and could not be used as part of the "borrowing base." When loans became delinquent, Auto Masters was supposed to subtract the value of those loans from total value of "eligible loans" on the "borrowing base certificate."

12. When a vehicle was sold and financed by Auto Masters, the associated car loan data was input into AMS. Car loan payments were also recorded in AMS. Customer service

representatives at each Dealership were responsible for collecting payments on the car loans and for inputting that information into AMS. R.J., C.Q., and others provided consolidated loan data from AMS to **STEVEN L. PIPER** so that **STEVEN L. PIPER** could prepare the monthly "borrowing base certificates." **STEVEN L. PIPER** then sent the "borrowing base certificates" to Capital One to report the total value of "eligible loans," which formed the collateral for the LOC.

13. **STEVEN L. PIPER** was required to submit "borrowing base certificates" to Capital One each month. In August 2017, **STEVEN L. PIPER** submitted a "borrowing base certificate" to Capital One representing that as of July 31, 2017, the total value of "eligible loans" was $91,677,386.

14. **STEVEN L. PIPER** periodically requested draws from Capital One based on the value of the collateral that was reported on the "borrowing base certificates." **MARK JANBAKHSH** and **STEVEN L. PIPER** were responsible for distributing funds from the draws on the LOC.

15. On October 9, 2017, **STEVEN L. PIPER** emailed and caused to be emailed a "borrowing base certificate" to Capital One for the period ending September 31, 2017, disclosing that Auto Masters had overstated its collateral by over $33 million. In the "borrowing base certificate," Auto Masters admitted that it had drawn over $26.4 million more than Auto Masters was permitted to draw under the terms of the LOC.

16. On or about October 17, 2017, Auto Masters filed for bankruptcy in the Middle District of Tennessee under Title 11, United States Code, in the case of *In re: Auto Masters, LLC, et al.*, Case No. 3:17-BK-07036. During the course of the bankruptcy proceedings, Capital One scheduled depositions of Auto Masters owners and employees. A deposition is a statement given under oath. **MARK JANBAKHSH, STEVEN L. PIPER**, and R.J. each provided a deposition in

connection with the bankruptcy proceedings. Capital One sought to depose C.Q., but he left the jurisdiction.

17. During the bankruptcy proceedings, the bankruptcy receiver determined that as of July 31, 2017, Auto Masters had overstated its collateral by nearly $37 million, and that Auto Masters had drawn over $24 million more than Auto Masters was permitted to draw under the terms of the LOC.

## COUNT ONE

18. Paragraphs One (1) through Seventeen (17) are re-alleged and incorporated by reference as though fully set forth herein.

19. From in or around at least 2013 and continuing through in or about April 2022, in the Middle District of Tennessee and elsewhere, **MARK JANBAKHSH** and **STEVEN L. PIPER** did willfully, knowingly, and unlawfully combine, conspire, confederate, and agree with R.J., C.Q., and others known and unknown to the Grand Jury to commit certain offenses against the United States, that is: to commit bank fraud, in violation of Title 18, United States Code, Section 1344 by engaging in a scheme and artifice to defraud Capital One and First Tennessee to obtain moneys, funds, and property owned by, and under the custody and control of Capital One and First Tennessee by means of false or fraudulent pretenses, representations and promises.

### PURPOSE OF THE CONSPIRACY

20. It was the purpose of the conspiracy for **MARK JANBAKHSH** and **STEVEN L. PIPER** and their co-conspirators, including R.J. and C.Q., and others known and unknown to the Grand Jury, to unlawfully enrich themselves by, among other things:

A. Inputting false car loan payments in the AMS system for delinquent car loans to make it appear as though those car loans were not delinquent by more than 60 days;

B. Fraudulently including those delinquent car loans on the "borrowing base certificates" that were submitted to Capital One, well knowing that those car loans were not "eligible loans" and that they should not have been included in the total value of "eligible loans" reported on the "borrowing base certificates";

C. Submitting those false "borrowing base certificates" to Capital One to make it appear as though there was more collateral for the LOC than there actually was;

D. Requesting draws from the LOC in excess of the legitimate collateral;

E. Diverting proceeds of the fraud for their personal use and benefit, the use and benefit of others, and to further the conspiracy; and

F. Taking steps to conceal the fraud.

## MANNER AND MEANS

21. The manner and means by which **MARK JANBAKHSH** and **STEVEN L. PIPER** and their co-conspirators, including R.J. and C.Q., and others known and unknown to the Grand Jury, sought to accomplish the purpose of the conspiracy included, among other things, the following:

A. **STEVEN L. PIPER**, C.Q., R.J., and others identified car loans that were more than 60 days delinquent. **STEVEN L. PIPER** and **MARK JANBAKHSH** then directed C.Q. to post or cause others to post false payments in the AMS system for the delinquent car loans to make it appear as though those car loans were not delinquent by more than 60 days.

B. At the direction of **STEVEN L. PIPER** and **MARK JANBAKHSH**, C.Q. made or caused others to make further false entries in AMS to falsely and fraudulently increase the total value of the "eligible loans" that made up the "borrowing base." For example, C.Q. created false loans based on duplicate Vehicle Identification Numbers ("VIN numbers"), vehicles that had been repossessed, vehicles that had been paid off, and using information from customers who had applied for loans at Auto Masters, but whose loans had been turned down.

C. With the knowledge of **STEVEN L. PIPER** and **MARK JANBAKHSH**, R.J. also posted or caused others to post false payments in the AMS system to fraudulently increase the total value of the "eligible loans" that made up the "borrowing base" by entering false loan payments and creating false loans related to vehicles that had been repossessed, vehicles that had been paid off, and information from customers who had applied for loans at Auto Masters, but whose loans had been turned down.

D. With help and advice from C.Q., R.J. made or caused others to make false payments in AMS that made it appear as though car loans at Dealerships and an RFC that R.J. owned were not delinquent.

E. C.Q. concealed the falsified loans by using his administrator privileges to restrict user access in AMS so that only certain individuals, including **MARK JANBAKHSH, STEVEN L. PIPER**, and R.J., could see the fraudulent loans.

F. R.J. and C.Q. provided the falsified loan information from AMS to **STEVEN L. PIPER** so that **STEVEN L. PIPER** could prepare "borrowing base certificates" to submit to Capital One.

G. **STEVEN L. PIPER** submitted the false information to Capital One, knowing that the "borrowing base certificates" were fraudulent because the total value of the "eligible loans" reported on those certified documents was false.

H. **STEVEN L. PIPER** requested draws from Capital One based on the fraudulent "borrowing base certificates." **MARK JANBAKHSH** and **STEVEN L. PIPER** distributed the fraudulent proceeds. Some of the fraudulent proceeds were distributed to entities and bank accounts controlled by R.J., **MARK JANBAKHSH**, and others, including Plaza Mariachi.

I. The coconspirators communicated with each other and others about the scheme in person, on the phone, and over email or by text message.

J. **STEVEN L. PIPER**, C.Q., and others created spreadsheets that recorded the false loans, the real loans, or both, in furtherance of the scheme. **STEVEN L. PIPER** and C.Q. shared those spreadsheets amongst themselves and with **MARK JANBAKHSH**.

K. **MARK JANBAKHSH** and **STEVEN L. PIPER** and their coconspirators took steps to conceal the fraud.

## OVERT ACTS

22. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Tennessee and elsewhere, at least one of the following overt acts, among others:

A. On or about November 4, 2015, **STEVEN L. PIPER** sent an email to Capital One requesting a draw in the amount of $978,854 and attaching a false "borrowing base certificate" that **STEVEN L. PIPER** signed on November 4, 2015.

B. On or about February 17, 2016, **STEVEN L. PIPER** sent an email to

Capital One requesting a draw in the amount of $879,132 and attaching a false "borrowing base certificate" that **STEVEN L. PIPER** signed on February 17, 2016.

C. On or about May 12, 2016, C.Q. made or caused to be made a false entry into the AMS system that purported to be a car loan payment in the amount of $420 on Loan No. B6168.

D. On or about May 23, 2016, R.J. made or caused to be made a false entry into the AMS system that purported to be a car loan payment in the amount of $205 on Loan No. M1235.

E. On or about May 27, 2016, C.Q. sent an email to **MARK JANBAKHSH** and **STEVEN L. PIPER** discussing actions the coconspirators were taking in furtherance of the fraud and attaching a spreadsheet.

F. On or about June 15, 2016, **STEVEN L. PIPER** signed a "borrowing base certificate" for the month ending May 31, 2016, and submitted it to Capital One, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false.

G. On or about February 13, 2017, R.J. made or caused to be made a false entry into the AMS system that purported to be a car loan payment in the amount of $205 on Loan No. M1235.

H. On or about February 14, 2017, C.Q. made or caused to be made a false entry into the AMS system that appeared to be a car loan payment in the amount of $430 on Loan No. B6168.

I. On or about March 7, 2017, **STEVEN L. PIPER** sent an email to Capital One requesting a draw in the amount of $1.4 million and attaching a false "borrowing base

certificate" that **STEVEN L. PIPER** signed on March 7, 2017.

J. On or about March 18, 2017, C.Q. sent an email to **STEVEN L. PIPER** discussing actions the coconspirators were taking in furtherance of the fraud and attaching a spreadsheet.

K. On or about March 22, 2017, **STEVEN L. PIPER** sent an email to Capital One requesting a draw in the amount of $250,000 and attaching a false "borrowing base certificate" that **STEVEN L. PIPER** signed on March 22, 2017.

L. On or about March 28, 2017, **STEVEN L. PIPER** sent an email to Capital One requesting a draw in the amount of $800,000 and attaching a false "borrowing base certificate" that **STEVEN L. PIPER** signed on March 28, 2017.

M. On or about April 3, 2017, **STEVEN L. PIPER** emailed to Capital One a "borrowing base certificate," for the month ending February 28, 2017, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false.

N. On or about April 5, 2017, **STEVEN L. PIPER** sent an email to Capital One requesting a draw in the amount of $400,000 and attaching a false "borrowing base certificate" that **STEVEN L. PIPER** signed on April 5, 2017.

O. On or about July 12, 2017, C.Q. made or caused to be made a false entry into the AMS system that appeared to be a car loan payment in the amount of $450 on Loan No. B6168.

P. On or about July 17, 2017, R.J. made or caused to be made a false entry into the AMS system that purported to be a car loan payment in the amount of $205 on Loan No. M1235.

Q. On or about August 2, 2017, **STEVEN L. PIPER** emailed a spreadsheet to C.Q., titled "Paper spread 6-15-17 (Westlake).xlsx," which contained only the "real loans" (unfalsified loans) in the amount of approximately $60 million. **STEVEN L. PIPER** asked C.Q. to update the spreadsheet with "new paper originated that can be sold."

R. On or about August 21, 2017, **STEVEN L. PIPER** emailed a "borrowing base certificate" to Capital One, for the month ending July 31, 2017, knowing that the "borrowing base certificate" was false because the total value of "eligible loans" was false.

S. On or about October 7, 2017, R.J. made entries in AMS to "unwind" Loan No. M1235, which had the effect of deleting the loan accounts with false payments from AMS.

T. On or about November 16, 2017, **STEVEN L. PIPER** falsely testified under oath in a deposition related to the bankruptcy proceedings that he did not participate in actively falsifying the information in the AMS system; that he did not have any knowledge that anyone was actively falsifying information in the AMS system before October 2017; that he did not actively engage in any other activity to overstate eligible receivables under the borrowing base certificates provided to Capital One; that he was not aware if **MARK JANBAKHSH** had any knowledge of the fraud; and that he did not have any discussions with **MARK JANBAKHSH** about the overstatements or the effect on the borrowing base. Further, **STEVEN L. PIPER** materially misrepresented his own and others' involvement in the scheme.

U. On or about November 17, 2017, **MARK JANBAKHSH** falsely testified under oath in a deposition related to the bankruptcy proceedings that he was "absolutely not" involved in any actions to input false information into AMS; that he was "absolutely

not" involved in any actions to overstate the amount of eligible accounts that were reported to the lenders in the borrowing base certificates; that he did not direct anyone to input false information into AMS; that he did not direct anyone to overstate the amount of eligible accounts that were being reported to Capital One on the "borrowing base certificates;" and that he did not have any knowledge, prior to August 2017, of anyone inputting false information into AMS. Further, **MARK JANBAKHSH** materially misrepresented his own and others' involvement in the scheme.

      V.    On or about November 21, 2017, **MARK JANBAKHSH** falsely testified under oath in a hearing related to the bankruptcy proceedings that he first learned about the fraudulent overstatements in August 2017 and testified "I did not do any manipulation of data, no, nor did I have any knowledge of any manipulation of data."

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH SIX

THE GRAND JURY FURTHER CHARGES:

23.    Paragraphs One (1) through Twenty-Two (22) are hereby reincorporated and realleged as if fully set forth herein.

24.    On or about the dates listed in each Count below, in the Middle District of Tennessee and elsewhere, defendants **MARK JANBAKHSH** and **STEVEN L. PIPER** knowingly executed and attempted to execute a scheme and artifice to defraud Capital One and First Tennessee, which were financial institutions within the meaning of Title 18, United States Code, Section 20, and to obtain moneys, funds, and property owned by, and under the custody and control of Capital One by means of materially false and fraudulent pretenses, representations and promises.

| Count | Date | Means of Execution |
|---|---|---|
| TWO | 06/15/2016 | Submitting a "borrowing base certificate" for the month ending May 31, 2016, to Capital One, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false |
| THREE | 03/07/2017 | Sending an email to Capital One requesting a draw in the amount of $1.4 million and attaching a false "borrowing base certificate" as of March 7, 2017, which was fraudulent because the total value of "eligible loans" was false |
| FOUR | 04/03/2017 | Sending an email to Capital One and attaching a "borrowing base certificate," for the month ending February 28, 2017, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false |
| FIVE | 04/05/2017 | Sending an email to Capital One requesting a draw in the amount of $400,000 and attaching a "borrowing base certificate" as of April 5, 2017, which was fraudulent because the total value of "eligible loans" was false |
| SIX | 08/21/2017 | Sending an email to Capital One and attaching a "borrowing base certificate," for the month ending July 31, 2017, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false |

In violation of Title 18, United States Code, Sections 1344(1) and 2.

## COUNTS SEVEN THROUGH ELEVEN

THE GRAND JURY FURTHER CHARGES:

25. Paragraphs One (1) through Twenty-Four (24) are re-alleged and incorporated by reference as though fully set forth herein.

26. On or about the dates listed in each Count below, in the Middle District of Tennessee and elsewhere, **MARK JANBAKHSH** and **STEVEN L. PIPER** knowingly made and caused to be made a false statement and willfully overvalued property and security for the purpose of influencing the actions of Capital One and First Tennessee, which were financial institutions within the meaning of Title 18, United States Code, Section 20, in connection with an advance,

13

Case 3:22-cr-00340   Document 3   Filed 10/24/22   Page 13 of 20 PageID #: 15

commitment, and loan, and any change or extension of any of the same, by renewal, deferment of action or otherwise, and the acceptance, release, or substitution of security therefore in that **MARK JANBAKHSH** and **STEVEN L. PIPER** submitted and caused to be submitted false "borrowing base certificates" to Capital One, falsely stating and willfully overvaluing the total value of "eligible loans" held by Auto Masters, when in truth and in fact, as the defendants well knew, that the true value of "eligible loans" was far less than what was represented on the "borrowing base certificates."

| Count | Date | Means of Execution |
|---|---|---|
| SEVEN | 11/04/2015 | Sending an email to Capital One requesting a draw in the amount of $978,854 and attaching a false "borrowing base certificate" as of November 4, 2015, which was fraudulent because the total value of "eligible loans" was false |
| EIGHT | 02/17/2016 | Sending an email to Capital One requesting a draw in the amount of $879,132 and attaching a false "borrowing base certificate" as of February 17, 2016, which was fraudulent because the total value of "eligible loans" was false |
| NINE | 03/07/2017 | Sending an email to Capital One requesting a draw in the amount of $1.4 million and attaching a false "borrowing base certificate" as of March 7, 2017, which was fraudulent because the total value of "eligible loans" was false |
| TEN | 03/22/2017 | Sending an email to Capital One requesting a draw in the amount of $250,000 and attaching a false "borrowing base certificate" as of March 22, 2017, which was fraudulent because the total value of "eligible loans" was false |
| ELEVEN | 03/28/2017 | Sending an email to Capital One requesting a draw in the amount of $800,000 and attaching a false "borrowing base certificate" as of March 28, 2017, which was fraudulent because the total value of "eligible loans" was false |

In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNTS TWELVE THROUGH FOURTEEN

THE GRAND JURY FURTHER CHARGES:

27. Paragraphs One (1) through Twenty-Six (26) are re-alleged and incorporated by reference as though fully set forth herein.

28. On or about the dates listed in each Count below, in the Middle District of Tennessee, the Defendant listed in each Count, with the intent to devise a scheme and artifice to defraud Capital One and First Tennessee, as described above in Counts One through Eleven, and for the purpose of executing and concealing said scheme and artifice, made the following false and fraudulent representations, claims, and promises concerning and in relation to a proceeding under Title 11, United States Code, that is, the matter of *In re: Auto Masters, LLC, et al*, Case No. 3:17-bk-07036, as further described in each Count below:

| Count | Date | Defendant | False and Fraudulent Representation, Claim, and Promise |
|---|---|---|---|
| TWELVE | 11/16/2017 | **STEVEN L. PIPER** | Falsely testifying under oath in a deposition that he did not know about, participate in, or actively engage in the false entries that overstated the total value of "eligible loans" reflected on the "borrowing base certificates" submitted to Capital One |
| THIRTEEN | 11/17/2017 | **MARK JANBAKHSH** | Falsely testifying under oath in a deposition that he did not know about, participate in, or direct the false entries that overstated the total value of "eligible loans" reflected on the "borrowing base certificates" submitted to Capital One |
| FOURTEEN | 11/21/2017 | **MARK JANBAKHSH** | Falsely testifying under oath in a hearing related to the bankruptcy proceeding that he did not manipulate any data or know about the manipulation of any data in AMS |

In violation of Title 18, United States Code, Sections 157 and 2.

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES:

29. Paragraphs One (1) through Twenty-Eight (28) are re-alleged and incorporated by reference as though fully set forth herein.

30. On or about November 16, 2017, in the Middle District of Tennessee and elsewhere, **STEVEN L. PIPER** knowingly and fraudulently made a false material statement under

oath in and in relation to a case under Title 11, *In Re: Auto Masters, LLC, et. al.*, Case No. 3:17-bk-07036, by falsely testifying under oath during a deposition in the matter that he did not know about, participate in, or actively engage in the fraudulent entries that overstated the total value of "eligible loans" reflected on the "borrowing base certificates" submitted to Capital One.

In violation of Title 18, United States Code, Sections 152(2) and 2.

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES:

31. Paragraphs One (1) through Twenty-Eight (28) are re-alleged and incorporated by reference as though fully set forth herein.

32. On or about November 17, 2017, in the Middle District of Tennessee and elsewhere, **MARK JANBAKHSH** knowingly and fraudulently made a false material statement under oath in and in relation to a case under Title 11, *In Re: Auto Masters, LLC, et. al.*, Case No. 3:17-bk-07036, by falsely testifying under oath during a deposition in the matter that he did not know about, participate in, or direct the fraudulent entries that overstated the total value of "eligible loans" reflected on the "borrowing base certificates" submitted to Capital One.

In violation of Title 18, United States Code, Sections 152(2) and 2.

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES:

33. Paragraphs One (1) through Twenty-Eight (28) are re-alleged and incorporated by reference as though fully set forth herein.

34. On or about November 21, 2017, in the Middle District of Tennessee and elsewhere, **MARK JANBAKHSH** knowingly and fraudulently made a false material statement under oath in and in relation to a case under Title 11, *In Re: Auto Masters, LLC, et. al.*, Case No.

3:17-bk-07036, by falsely testifying under oath during a hearing in the matter that he did not manipulate any data or previously know about the manipulation of any data in AMS.

In violation of Title 18, United States Code, Sections 152(2) and 2.

### COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES:

35. Paragraphs One (1) through Thirty-Four (34) are re-alleged and incorporated by reference as though fully set forth herein.

36. On or about April 14, 2022, in the in the Middle District of Tennessee and elsewhere, **MARK JANBAKHSH** did knowingly intimidate, threaten, corruptly persuade, and engage in misleading conduct toward, and attempt to intimidate, threaten, corruptly persuade, and engage in misleading conduct toward C.Q. by encouraging C.Q. to leave the jurisdiction, giving C.Q. a cash payment of $10,000, and promising to pay C.Q. an additional sum of approximately $300,000 if he would leave the jurisdiction, with the intent to hinder, delay, and prevent the communication to federal law enforcement officers of information relating to the commission and possible commission of a Federal offense, including the offenses enumerated in Counts One through Eleven, listed above.

In violation of Title 18, United States Code, Section 1512(b)(3).

### COUNTS NINETEEN THROUGH TWENTY-ONE

THE GRAND JURY FURTHER CHARGES:

37. Paragraphs One (1) through Twenty-Eight (28) are re-alleged and incorporated by reference as though fully set forth herein.

38. On or about the dates listed in each count below, in the Middle District of Tennessee, and elsewhere, **STEVEN L. PIPER** willfully made and subscribed, and filed and

17

Case 3:22-cr-00340 Document 3 Filed 10/24/22 Page 17 of 20 PageID #: 19

caused to be filed with the Internal Revenue Service, a false U.S. Individual Income Tax Return, Form 1040, for the calendar year listed in each count, below, which was verified by a written declaration that it was made under the penalties of perjury, and which **STEVEN L. PIPER** did not believe to be true and correct as to every material matter, in that the tax returns reported that **STEVEN L. PIPER** and his wife had total income on the lines listed in each count below, whereas, as **STEVEN L. PIPER** knew he and his wife had more income than was reported on those lines.

| Count | Date | Tax Year | False Item |
|---|---|---|---|
| NINETEEN | 11/27/2017 | 2016 | False "total income" reported on Line 22 in the amount of $168,933 |
| TWENTY | 07/05/2018 | 2017 | False "total income" reported on Line 22 in the amount of $180,449 |
| TWENTY-ONE | 10/05/2020 | 2019 | False "total income" reported on Line 7b in the amount of $158,577 |

In violation of Title 26, United States Code, Sections 7206(1) and 2.

## FORFEITURE ALLEGATION

THE GRAND JURY FURTHER CHARGES:

39. The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for purposes of alleging forfeiture to the United States of certain property in which the defendant has an interest.

40. Upon conviction of Count One, **MARK JANBAKHSH** and **STEVEN L. PIPER** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to a violation Title 18, United States Code, Section 371, including the underlying specified unlawful activity of Title 18, United States Code, Section 1344 (bank fraud), pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461. The property subject to forfeiture includes, but is not limited to, a money judgment representing the proceeds of the scheme and artifice to defraud as alleged in Count One.

41. Upon conviction of bank fraud as alleged in Counts Two, Three, Four, Five, and Six, and falsification of statements and valuation of property to financial institutions to influence loan release as charged in Counts Seven, Eight, Nine, Ten, and Eleven, **MARK JANBAKHSH** and **STEVEN L. PIPER** shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation pursuant to Title 18, United States Code, Section 982(a)(2). The property subject to forfeiture includes, but is not limited to, a money judgment representing the proceeds of the scheme and artifice to defraud as alleged in Counts Two through Eleven.

42. Upon conviction of making a false oath in relation to a bankruptcy proceeding as alleged in Count Fifteen as to **STEVEN L. PIPER** and Counts Sixteen and Seventeen as to **MARK JANBAKHSH**, and upon conviction of obstruction of justice as alleged in Count Eighteen as to **MARK JANBAKHSH**, then **MARK JANBAKHSH** and **STEVEN L. PIPER** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violation or a conspiracy to commit such violation pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461. The property subject to forfeiture includes, but is not limited to, a money judgment representing the proceeds of the scheme and artifice to defraud as alleged in Count Fifteen as to **STEVEN L. PIPER**, and Counts Sixteen, Seventeen, and Eighteen as to **MARK JANBAKHSH**.

43. If any of the above-described forfeitable property, as a result of any act or omission of **MARK JANBAKHSH** or **STEVEN L. PIPER**:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **MARK JANBAKHSH** and **STEVEN L. PIPER**, up to the value of said property listed above as subject to forfeiture.

A TRUE BILL.



FOREPERSON

MARK H. WILDASIN  
UNITED STATES ATTORNEY

KATHRYN W. BOOTH  
ASSISTANT UNITED STATES ATTORNEY

THOMAS JAWORSKI  
ASSISTANT UNITED STATES ATTORNEY