**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MAHAN JANBAKHSH, ) | |
| ) | Case No. 3:22-CR-00340 |
| a/k/a MARK JANBAKHSH, ) | |
| ) | |
| and STEVEN PIPER, ) | |
| ) | |
| ) | |
| Defendants. ) | |

### DEFENDANT JANBAKHSH'S MOTION TO DISMISS THE INDICTMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant Mahan "Mark" Janbakhsh, by and through undersigned counsel, hereby moves this Court to dismiss the indictment against him pursuant to the Due Process Clause of the U.S. Constitution.

### SUMMARY

Imagine being accused of altering entries in a book that no longer exists. The prosecution claims you directed others to change specific words on certain pages, but the book itself has vanished. The government's experts were allowed to read and analyze the book *before* it disappeared, but you cannot examine it to defend yourself. When you ask to see the book, you're told it's gone forever. When you ask what happened to it, you receive only vague, shifting explanations. When you request any information about the book's contents, you're given a few torn pages from an earlier draft that predates the alleged alterations.

This is not a hypothetical scenario. It is precisely the situation Mark Janbakhsh faces in this prosecution.

The government has built its entire case on allegations that Janbakhsh directed the manipulation of data within the Auto Masters System ("AMS") database—a database that no longer exists in its complete form. Every substantive allegation in the indictment stems from this missing database. Yet while the government's experts, who prepared reports at the behest of the alleged *victim* in this case, had unfettered access to analyze this evidence and extract the information that supported their theory of prosecution, Janbakhsh has been denied the opportunity to examine the same evidence to establish his innocence.

This is not merely an evidentiary dispute; it is a fundamental due process violation that strikes at the heart of our adversarial system of justice. The Supreme Court has long recognized that criminal defendants must be "afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). When the government fails to preserve evidence that "might be expected to play a significant role in the suspect's defense," *id*. at 488, it deprives the defendant of this fundamental right.

The AMS database was not peripheral to this case—it was the case. It would have revealed who accessed and modified loan data, when those modifications occurred, and whether Janbakhsh had any involvement whatsoever. Without this critical evidence, Janbakhsh cannot effectively challenge the government's allegations or establish his innocence. The database's exculpatory value was apparent

before it vanished, and no comparable evidence exists. Under these circumstances, Due Process demands dismissal of the indictment.

As detailed below, the government's failure to preserve this crucial evidence violates Janbakhsh's due process rights under both the *Trombetta* standard for materially exculpatory evidence and the *Arizona v. Youngblood* standard for potentially useful evidence.

FACTUAL BACKGROUND

**I.      The AMS Database is the foundation of the indictment.**

At the heart of this prosecution lies a database that no longer exists. According to the government, Janbakhsh orchestrated a scheme to falsify loan payment information in AMS to inflate Auto Masters' borrowing base with Capital One, resulting in an over-extension of $26.4 million in credit. Every substantive allegation in the indictment—from the alleged falsification of payment histories to the purported "unwinding" of loan entries—depends on what was entered into the AMS database, when it was entered, and by whom. (Dkt. 3, *passim*.) The government's theory, as detailed in the indictment, is that Janbakhsh directed others to make false entries in the AMS database to disguise delinquent loans as current, thereby artificially inflating the value of "eligible loans" that could be included in Auto Masters' borrowing base. Count 17 specifically charges Janbakhsh with perjury for testifying in bankruptcy proceedings that he "did not manipulate any data or previously know about the manipulation of any data in AMS." (*Id*. at 16-17.) Without

3

access to the complete AMS database, Janbakhsh cannot effectively refute this charge or any of the underlying fraud allegations.

**II.    The government and its experts had the AMS database and lost it.**

The indictment against Janbakhsh rests entirely on alleged manipulations of loan data within the AMS database between 2015 and 2017. But the government does not possess, nor is it relying upon, the database itself—just purported reports extracted from the database by its experts.

The government's criminal investigation began far earlier than it has acknowledged—at a time when the AMS database was still accessible and under the control of the government's future expert witnesses. Documentary evidence confirms that the investigation began as early as October 2017, when Capital One deployed members of Berkeley Research Group ("BRG") to conduct an audit of Auto Masters. During this audit, BRG was provided extensive access to the AMS system. Between October 6 and 20, 2017, a BRG expert wrote in handwritten notes regarding his investigation into Auto Masters: "Call FBI!!!!" Exhibit 1. This contemporaneous note—made while BRG was actively examining the AMS database—strongly suggests that the government launched its investigation into Auto Masters in October 2017, just as the bankruptcy proceedings were beginning.

At the very latest, the government's criminal investigation began in early 2018, as evidenced by the case number assigned to the investigation. Exhibit 2 at 9. This timing is critical: it proves the government's investigation began while MCA

4

Financial Group was still the court-appointed receiver with full control of the AMS database. During this period, MCA employees Holly Daetwyler and Morrie Aaron— now the government's expert witnesses—extracted the selective data reports on which the government's case now relies. They had extensive access to and control over the AMS database, without which *there would be no reports* on which the government could now rely:

- On December 6, 2017, Daetwyler emailed about having "full access to ALL modules within AMS with a user login."

- On February 21-22, 2018, Auto Masters Systems worked with MCA to provide a multi-day training on how to pull reports from AMS, build custom reports, and delete accounts.

- MCA continued to review the AMS database until at least August 2019, well after the receivership ended.

- In June 2019, MCA was already speaking with an IRS Special Agent about the investigation of Auto Masters.

*See* Dkt. 178-7, 178-8. 178-9. Through all of this, the government never took steps to preserve the AMS database. It lost the database as it continued to investigate. According to a June 2021 memorandum drafted by Special Agent Suzanne M. Poshedley: "MCA . . . *did not maintain the subscription with AMS* once the Loan Portfolio was sold and the bankruptcy was closed." Exhibit 3 at 2. In other words, MCA finished its work for Capital One and allowed the evidence to be lost.

## III. The government knew the AMS database was crucial from the moment it started investigating.

The AMS database and the reports on which the government relies in this case (Dkt. 68, 69) are not the same thing. The government has long been aware of the

critical importance of the AMS database to this case, and that its own expert reports were "generated" from it. (Dkt. 178-13.)

With its privileged access, MCA identified what they characterized as data irregularities within the AMS database, particularly the alleged "unwinds" of loan payments that feature prominently in the government's case. MCA produced detailed reports analyzing these alleged irregularities, which the government has now adopted as the foundation of its prosecution. The government clearly recognized the database's evidentiary value, as demonstrated by its heavy reliance on MCA's analysis in the indictment and its expert disclosures.

Despite knowing the database's central importance, neither the government nor its MCA experts took any steps to preserve the complete database or even comprehensive extracts that would allow for independent verification of their findings. Instead, they preserved only selective reports and analyses that support the government's theory of the case, while allowing the underlying source data to disappear.

Stunningly, neither Daetwyler nor Aaron listed the AMS database as something they considered in reaching their conclusions. This blinks reality. The omission is, at minimum, misleading. We know MCA was accessing the actual AMS database—they took screenshots of it:





Exhibit 4. Daetwyler and Aaron claiming they relied only on reports generated from

the AMS database rather than the database itself is like a doctor claiming she did not

rely on her physical exam of the patient, only on the notes she took while examining

the patient. The notes cannot exist without the patient exam, contain only what the doctor chose to record, and no one can verify if the notes accurately represent the patient's condition.

When Janbakhsh requested access to the AMS database following his indictment, the government initially claimed it "did not possess the full AMS database" and had never "possessed or had access to it." Dkt. 98 at 1. This position was difficult to reconcile with the indictment's detailed allegations about specific entries in the database. The government also admitted that its MCA experts "may have had access to the [full] AMS database (in connection with the bankruptcy)," though they allegedly "no longer [have] such access." *Id*. at 4. This fact is beyond dispute, and the government's reluctance to admit it defies explanation.

The destruction of the AMS database creates a fundamentally unfair situation. In 2017, Janbakhsh lost all access to Auto Masters' systems during bankruptcy proceedings when MCA took over as court-appointed receiver. This meant that while the government's future expert witnesses (MCA's Daetwyler and Aaron) had complete control over the database, Janbakhsh himself had no ability to access, examine, or preserve this critical evidence. The government essentially allowed its own experts to control—and ultimately destroy—the very evidence Janbakhsh would need to defend himself, during a period when he was powerless to protect it.

IV.    **There is no evidence comparable to the AMS database.**

Janbakhsh has made extraordinary efforts to obtain the AMS database or comparable evidence from other sources. He retained a digital forensic examiner to

analyze old computer servers that had been in his possession to determine if any AMS data existed on them. His counsel worked with an expert who has extensive experience with AMS and contacted representatives of AMS itself to determine if the data could be recovered. All these efforts proved futile.

There is no substitute for the AMS database. It was a proprietary, complex relational database that contained unique information about Auto Masters' operations. The user activity logs, audit trails, and complete loan histories cannot be reconstructed from the static and limited reports the government has adopted from the MCA experts. The MCA experts had access to the live database and extracted the information that supported their conclusions, but Janbakhsh has been denied the opportunity to conduct his own analysis of the same data.

Were Janbakhsh able to access the AMS database in the same manner as the MCA experts, here is just some of what he could have done as part of defending himself against the allegations in the indictment:

- Retain an expert to compare the actual AMS database with MCA's selective extracts to identify mischaracterizations that formed the basis of the government's case

- Extract user activity logs and audit trails showing *exactly who* accessed the AMS database and made entries, proving Janbakhsh was not logged in during critical data modifications;

- Analyze permission levels within the AMS database to demonstrate Janbakhsh lacked the technical capability to view or modify the specific loan data allegedly manipulated;

- Investigate the source and impact of the January 2018 virus that "could have been contracted months ago" and may have altered data without human intervention, according to MCA;

- Document unauthorized system access by Steve Piper, Ron Janbakhsh, and others that contradicts MCA's claims about system integrity;

- Challenge the accuracy and completeness of the government's expert analysis, which was based on data that Janbakhsh cannot access;

- Provide the AMS database to an expert of Janbakhsh's own for review in order to establish normal business patterns across thousands of loans to provide context and show that the allegedly fraudulent entries were routine and legitimate adjustments;

- Defend against the perjury charge by demonstrating the truthfulness of his bankruptcy testimony regarding his knowledge of data manipulation.

STANDARD OF REVIEW

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to disclose to a criminal defendant, upon request, any evidence in its possession that is material and favorable to his defense. The government violates a Defendant's due process rights when it destroys material, exculpatory evidence. *See California v. Trombetta*, 467 U.S. 479, 486–89 (1984). Evidence is material when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Additionally, for evidence to be material, its exculpatory significance must be both "apparent before" destruction, and the defendant must be unable to "obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. "The destruction of material[,] exculpatory evidence violates; [a defendant's] due process [rights] regardless of whether the government acted in bad faith." *Unites States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

When the analysis centers on "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," however, the defendant must make a showing of bad faith on the part of the government to prove a due process violation. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). In other words, if the exculpatory value of the evidence is not apparent, but only "potentially useful" for the defense, then the defendant must show that the government acted in bad faith in destroying the evidence. *Id.* The Supreme Court specifically stated that the presence or absence of bad faith by the police, for purposes of the Due Process Clause, "must necessarily turn on the police's *knowledge* of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 (emphasis added).

ARGUMENT

The government's failure to preserve the AMS database—the central evidence in this case—has irreparably prejudiced Janbakhsh's ability to defend himself, violating his constitutional rights in three distinct ways.

First, the AMS database contained materially exculpatory evidence that would have revealed who actually accessed and modified loan data, what impact a virus had on the integrity of the data, and whether the government's experts correctly exported data from the system. All of this information would have exonerated Janbakhsh under the *California v. Trombetta* standard.

Second, even if the Court applies the heightened *Arizona v. Youngblood* standard for potentially useful evidence, Janbakhsh seeks to dismiss. The AMS

database was potentially useful, and Janbakhsh has sought to compel evidence that the government lost it in bad faith.

## I.     The indictment should be dismissed under *California v. Trombetta.*

The AMS database would have been without question a significant part of Janbakhsh's defense. It is the original and only source of every single allegedly fraudulent act alleged in the indictment. For these reasons, the *California v. Trombetta* standard applies, and any of the government's purported good faith efforts to preserve it are irrelevant.

### A.     *The AMS database would have played a significant role in Janbakhsh's defense.*

The AMS database easily clears the low bar for materiality under *Trombetta*. Evidence is material when it "might be expected to play a significant role in the suspect's defense." *Trombetta*, at 488. The AMS database it is not merely relevant but essential to every allegation in the indictment.

The AMS database was basic Fed. R. Crim. P. 16(a)(1)(E) discovery that should have been produced to Janbakhsh. It tended to support Janbakhsh's potential defenses that the government's reports derived from the database are fundamentally flawed. The government references the database 32 times in the indictment, using it as the foundation for every substantive charge. Dkt. 3. Count 17 specifically charges Janbakhsh with perjury for allegedly lying about data manipulation "*in* AMS." *Id*. at 16. Without access to the complete database, Janbakhsh cannot possibly defend against this charge or any others.

The government's own MCA experts confirm the database's significant role. To form her opinions for the bankruptcy case, MCA knew it needed full access to AMS and even sought specialized multi-day training on how to pull reports, build custom reports, and even delete accounts from the AMS database—all in hope of identifying purportedly fraudulent entries within the database itself. Exhibit 5. The fact that the government's chosen MCA experts in this case are the very last people who had access to the AMS database before it was destroyed says all that needs to be said about the database's central importance to this case.

B.      *The AMS database's exculpatory value was apparent when MCA lost it.*

Janbakhsh must next show that the AMS database had some "exculpatory value that was apparent before the evidence was destroyed." *Trombetta*, at 489. The Supreme Court has clarified that "exculpatory" includes any evidence that could "create[] a reasonable doubt that did not otherwise exist," *United States v. Agurs*, 427 U.S. 97, 112 (1976), "undermine confidence in the verdict" *Wearry v. Cain*, 577 U.S. 385 (2016, or even just support "alternative theories." *Cone v. Bell*, 556 U.S. 449, 467 (2009). The AMS database would have done all of these.

*First*, evidence that Janbakhsh did not directly input or access the AMS database—something that the government's MCA experts never allege—would create reasonable doubt in the minds of the jury. Janbakhsh could have used the database's comprehensive user activity logs to prove specific individuals other than himself made the allegedly fraudulent entries—creating reasonable doubt by demonstrating the physical impossibility of his direct involvement. For example, the database's

activity logs would have shown conclusively that Janbakhsh never even logged into the database when critical data changes occurred. Janbakhsh also could have analyzed permission levels across the database's approximately 100 users to demonstrate he lacked the technical ability to access or modify certain loan data—directly undermining the government's theory that he personally directed the fraud. This would have exposed the fundamental implausibility of the government's narrative.

*Second*, the actual AMS database would have supported alternative theories as well. The government's own MCA expert acknowledged that a virus in the AMS database in January 2018 "could have been contracted months ago and is just now manifesting," presenting a clear alternative explanation for data irregularities. Exhibit 6 at 2. The complete database would have provided context for allegedly fraudulent transactions, potentially showing they were routine business adjustments rather than fraud. Furthermore, if Janbakhsh had the AMS database, he could use the activity logs to fully demonstrate which users were responsible for the fraudulent entries, when they made the entries, and which loans they falsified. In other words, Janbakhsh could point to an alternative theory about how the purportedly false entries were made.

    C.    *Comparable evidence cannot be obtained through other reasonable means.*

The destroyed evidence be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, at 489. Despite extraordinary efforts, Janbakhsh cannot recreate or

obtain the AMS database from any other source. As the Ninth Circuit has held, "[g]eneral testimony about the possible nature of the destroyed [evidence] [is] an inadequate substitute for testimony informed by its examination." *United States v. Cooper*, 983 F.2d 928, 932 (9th Cir. 1993) (dismissing an indictment under *Trombetta* where the government destroyed the lab equipment that defendant contended was incapable of making methamphetamine). Such is the case here where all the government's experts preserve were selective data reports generated by the AMS database.

But the data reports cannot be accepted at face value. According to the Vice President of company that licenses the database, it is impossible to "verify the accuracy of a data report without having the database" itself. Dkt. 165-2 at 3-4. The AMS database was a proprietary, complex relational database with unique audit functionality that cannot be reconstructed. MCA had access to the live, functional database during the bankruptcy proceedings for nearly two years, extracting only the information that supported the conclusions it reached on behalf of Capital One. Those conclusions cannot be reproduced or tested in anyway because no one has anyway of generating contrasting data. Janbakhsh—who had no control of Auto Masters during the bankruptcy period—had no ability to access or preserve the AMS database. This fundamental asymmetry has deprived Janbakhsh of his constitutional right to present a complete defense. *E.g.*, *United States v. Bohl*, 25 F.3d 904, 911 (10th Cir. 1994) (dismissing indictment under *Trombetta* where the government destroyed radio tower legs that its chemist had tested).

The government's reliance on MCA's selective data reports rather than the actual AMS database also violates the "best evidence rule," which requires an "original writing, recording, or photograph" to prove its content. Fed. R. Evid. 1002. The AMS database—the primary record containing the loan data, user activities, and system information at issue—constitutes the "original writing," not MCA's self-selected extracts. Courts have applied this rule to electronic databases. *See United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (applying best evidence rule to computer records). Rule 1002 exists precisely to prevent parties from establishing the content of digital records through secondary evidence when the original has been destroyed. This additional evidentiary violation further supports dismissal.

### D. The government's good faith is irrelevant under *Trombetta*.

As the Sixth Circuit has held, a defendant's due process rights are violated when material exculpatory evidence is suppressed, regardless of whether the suppression results from good or bad faith. *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). The government began its investigation while MCA had full control over the AMS database, yet it failed to take any steps to preserve this critical evidence despite its obvious importance.

This case presents the precise situation *Trombetta* was designed to prevent: the government building a prosecution on evidence it had access to examine but that the defendant cannot. The loss of the AMS database—the central evidence in this case—has irreparably prejudiced Janbakhsh's ability to defend himself. Due process requires dismissal of the indictment.

## II. Alternatively, Janbakhsh requires the AMS-related materials to determine whether a *Youngblood* motion is supported.

Alternatively, Janbakhsh needs the AMS-related materials he has sought to compel the government to product (Dkt. 165, 178) to determine whether grounds exist for a motion to dismiss under *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). Under *Youngblood*, dismissal is appropriate when the government loses "potentially useful evidence" in bad faith. *Wright*, 260 F.3d at 571. This requires showing: (1) that the exculpatory value of the evidence was apparent before its destruction; (2) that the defendant cannot obtain comparable evidence by other reasonably available means; and (3) that the government acted in bad faith. *Jobson*, 102 F.3d at 219.

### A. The AMS database clearly qualifies as "potentially useful" evidence.

The AMS database unquestionably contained evidence "that could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. As confirmed by the Vice President of the company that licenses the AMS software, there is "no way" for Janbakhsh to verify anything in the MCA experts' reports without access to the database itself. Dkt. 165-2 at 4.

The database contained comprehensive user activity logs and audit trails that would have shown who accessed the system and made the allegedly fraudulent entries. It would have revealed permission settings that could demonstrate whether Janbakhsh even had the technical capability to manipulate the specific loan data in question. It also would have documented the impact of the January 2018 virus that Daetwyler acknowledged "could have been contracted months ago," potentially supporting alternative explanations for the data anomalies. Exhibit 6 at 2.

With approximately 100 users across 15 entities having access to the system, the database represented the only comprehensive source that could have established alternative explanations for the alleged fraud.

      B.      *The AMS-related materials Janbakhsh has sought to compel will demonstrate whether bad faith existed.*

While Janbakhsh has reason to believe bad faith may have existed in the government's failure to preserve the AMS database, he cannot fully make this argument without access to the materials requested in his motion to compel. But the government's inability to explain the destruction of the AMS database supports Janbakhsh's *Youngblood* argument. *See Bohl*, 25 F.3d at 913 ("[T]he absence of any innocent explanation offered by the government gives rise to a logical conclusion of bad faith.").

The AMS-related materials are critical to Janbakhsh's ability to evaluate potential bad faith in the government's handling of the AMS database, revealing a ground to dismiss the indictment. Investigative reports and communications mentioning AMS would establish precisely when the government became aware of the database's central importance to its case. (Dkt. 165 at 10.) Documentation of any preservation efforts would reveal whether the government issued instructions to MCA regarding the database during the nearly *two-year* period when the investigation was ongoing, and MCA still had access to it. (Dkt. 178 at 6-7.) Grand jury transcripts and communications about AMS would demonstrate how the government was actively using data extracted from the database while simultaneously failing to preserve the database itself. Without these materials,

Janbakhsh cannot determine why the government took no steps to preserve evidence it clearly knew was critical to the case—knowledge evidenced by the fact that the government's only experts in this case are financial analyst who spent hundreds of hours reviewing what was in the AMS database. (*Id.*) These materials will reveal whether Janbakhsh has grounds to move to dismiss the indictment based on the government's bad faith destruction of the AMS database.

To be sure, the evidence already suggests troubling circumstances. The government investigation began as early as October 2017 (when auditors wrote "Call FBI!!!!" in their notes) and formally opened in early 2018. Exhibit 1 at 3. Throughout this period, MCA—who would later become the government's expert witnesses—had exclusive control over the AMS database as court-appointed receiver. It accessed the database and provided its findings to FBI and IRS agents for the next two years. (*Id.* at 5-6.) Despite communications between MCA and government agencies during this time, the database was not preserved. And the government has never explained why.

Without the requested materials, Janbakhsh cannot determine whether the government's conduct rises to the level of bad faith necessary for a *Youngblood* motion. The Court should grant the motion to compel to allow Janbakhsh to properly evaluate whether grounds exist for such a motion.

CONCLUSION

For the foregoing reasons, this Court should dismiss the indictment.


Date: May 27, 2025        Respectfully submitted,

*/s/ Alex Little*
J. Alex Little (TN BPR #29858)
Zachary C. Lawson (TN BPR #36092)
John R. Glover (TN BPR #37772)
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co | zack@litson.co | jr@litson.co


**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2025, a true and correct copy of the foregoing

has been served via the Court's CM/ECF system upon all counsel of record.


*/s/ J. Alex Little*